May it please the court, Mark Stern for the appellants and with the court's permission I'll try to reserve five minutes for rebuttal. Okay and we're not going to be, at least I am not, nobody in this court is really, really sits on the clock. In this case and at least one of the other cases today really requires some pretty thorough exposition. Zahner really requires some pretty thorough exposition. There are a number of issues so don't have that anxiety attack when the yellow light comes on. The floor's not going to open up, you're not going to drop below. It's good to know. If I'm falling down I'll remember that. Not usually we see one person, oh you don't feel outgunned, outmanned or anything? Not yet anyhow. Not yet. Okay. All right. Thank you, Your Honor. Hi. Siri is talking to my colleague. Shut up, Siri. Don't start your clock here. We have it set. Okay. I think that the district courts in this case erred in accepting the theory advanced by the plaintiffs. Speak up please or get closer to the mic. Is this any better? That's better. Tell us, are you on Geneva or on the other case? Representing the government in all the cases. So you're talking about both cases? Yes. Okay. And the objection is to the contraceptive coverage regulations. I'll start somewhere. Where are we with the regulation, the 2014 regulation? Because there's an issue about that and I assume by the time this is decided, the only regulation that will be operating will be the 2014 regulation, not 2013. Well, the 2014 established, they amended the 2013. They're going through notice and comments. So, yes, they're basically as augmented. The regulations provide sort of two means by which a eligible. Hold on, Siri is not here. Turn the volume up. It's called unplug. I've never used this in court before. Maybe the last time. I said maybe the last time. First and last. Okay. Thank you. Okay. The regulations now provide two separate means by which an eligible organization can opt out of the requirement. They can either, as originally. We understand that. It seems like the new, the change to the regulation, I would assume your submission is that that amendment that says that they no longer have to use, I guess it would be something 700. They no longer have to basically, from your perspective, put themselves in a position where they're complicit with the paying for contraceptives. All they have to do is let the government know that they're availing themselves of the exemption. That's the new amendment. You're saying that I believe your position is given that amendment, especially given what the court said in Wheaton College, that that should be sufficient to establish any, to address any concerns they may have and therefore the government's, the district court's ruling about the likelihood of success on the merits was wrong because especially when we look at that new change, there's not a likelihood of success on the merits, especially in view of Wheaton College. That's correct, Your Honor. That would have been my opening statement that encapsulates our points. Obviously, we think that even prior to the augmentation that the regulation sort of survived scrutiny. Certainly, as augmented, it does. And the argument is the, sort of, continues to be, as I understand it, that notwithstanding that at this point the plaintiffs need only inform the government that they are opting out, that they are still to use. The responsibility is for the TPA. That's right. Essentially, what the plaintiffs are objecting to is a requirement that the government imposes independently on TPA or the third-party insurance provider. Well, that's your take on it, and that was the Seventh Circuit take on it. But if Geneva College decides, you know, is put in a position of saying, well, we're just not going to, if we have to do this, we're not going to provide health care to our employees, isn't that coercive? Isn't that a problem under the concept of the coercive aspect of the test? No. I mean, if you, I mean, what the Seventh Circuit and now also the Sixth Circuit and the D.C. Circuit, you know, have recognized is that what's extraordinary about these objections is that they're objecting to the ability to opt out. I mean, if there were no opt out, then we would be in the same position as the plaintiffs in Hobby Lobby. But the difference – Well, Hobby Lobby actually commented that the opt out is a way around. Exactly. But Hobby Lobby, the entire reasoning of Hobby Lobby, you know, Justice Alito's opinion, fourth majority, and I think this is emphasized particularly by Justice Kennedy's concurrence, is that there is – that the departments had themselves created the alternative, the opt out, and what the court emphasized was that this seamlessly provided the same coverage. The net effect on women would be zero. Would you answer my question about it being coercive? If the college is put in the position of saying, well, if we have to do this, then we're just going to drop coverage altogether. I don't think it's unconstitutionally coercive. I mean, you can't – an entity in any situation can't say, look, well, I won't – there is an opt out. I don't have to do it, but even the process of opting out is too – is something I object to, and therefore it's unconstitutionally coercive. I mean, that can be described, you know, in a sense as a burden, but the fact that the entity says I'm just not going to do it, I will stop providing coverage, if it comes to that, doesn't make it unconstitutional. Let me ask you a question. The opinion of the D.C. Circuit is the most specific of the other three, of the three opinions. Does the government take the position that Judge Millard's opinion is right straight across? Do you disagree with any part of it? No. It's a long opinion, and I reread it on the train coming up. It certainly is. Eighty-two pages. Yeah, but I did not see anything that didn't accord with the government's position. Okay. I think that the court, it's an exhaustive analysis, and I think, you know, deals with some issues that aren't even presented in this case. It deals with all the issues that are presented. To what extent should we concern ourselves with the rights of third parties here? And if we need to look at the rights of third parties, where is that? Is it under the substantial burden test? Is it under the use-restrictive test? How does that figure in? It's a good question, Your Honor. I think it clearly fits in at the strict scrutiny analysis, the sort of compelling interest, narrow, you know, and whether it's appropriately tailored. I think it also comes in. But those are two different things, compelling interest, one. Right. And whether it's narrowly tailored. I'm trying to figure out where in those two holes does that fit. Well, I think it comes in a little bit in both, because, I mean, it's got to be sort of a looking sort of at the real, what is trying to be achieved. And the goal of the statute is to provide this coverage to women. And the question is, how do you do, what's a reasonable alternative way of doing it to the general sort of provision of the statute? Sort of how could this opt-out sort of be structured? And what it has to do is to provide it sort of in terms of how you would tailor it. It has to be that you provide it in some sort of seamless way that doesn't impose additional burdens. And it also, their interest in protecting this, right, is, of course, crucial to the government's compelling interest in the matter. So I think it's sort of kind of the rights and interests of third parties and the goals of the statute sort of infuse the, you know, appropriately, the entire inquiry. What is the compelling interest? I think the D.C. Circuit identified a number of related compelling interests, which I think there's sort of a confluence of them. And the, I mean, there's the government's general interest in just being able to sort of fill gaps in a regulatory scheme. But there's specific interest, perhaps most importantly, in the provision of this important health service and also. It's awfully broad, isn't it, though? I mean, you know, compelling interest in the health of people. Okay. Of women. Of women. Because I think. Well, and women, as the D.C. Circuit points out, it also corrects a longstanding discrimination against sort of in the relative costs. Health services for women. Like that are being imposed on women as opposed to men. So I think that there are a number of different interests that come into play here. And five members of the Supreme Court, you know, recognized that there was a compelling interest, Justice Kennedy, and the dissenters. And it was, as Justice Kennedy emphasized, it was the premise, not accepted, but it was the premise of the majority's reasoning. Let me ask you a practical question. What happens if the eligible organization refuses to sign the self-certification and has a health plan that excludes coverage? Obviously, they're going to be subject to a fine. But what happens vis-a-vis the actual provision of services? Does the third-party payer then somehow figure out that it has to supply these services, or do the employees then not have coverage? What happens as a practical matter? Well, at least the insurers, and I think at least with respect to insurance companies, and I think it's different with respect to third-party administrators, but with regard to insurance companies, they've got an independent obligation. But how do they figure that out? That's why somebody has to say, I mean, all that the plaintiffs have to just tell somebody what they're doing. The question is what happens if they don't? Well, if they don't, I mean, that sort of then puts the insurers in a bind, and it puts them in violation of the law. Now, they don't want to be in violation of the law. They're in violation of the law whether they know or not, because they have a blanket obligation. Is that what you're saying? If it's not being provided elsewhere, they have to do that. Well, there is a regulatory requirement. They have an opt-out. And if they choose not to opt out but simply say, I'm not complying, I mean, that sort of would be a violation of the regulation, but all they need to do is to say, I'm opting out. I mean, there's no reason whatsoever to violate the law. I think my colleagues are asking you, as I understand the question, do they have an independent obligation to know this? How does the insurance company know? I think that's really – Yeah, they have an obligation to find out, to make sure of the coverages. Yeah, how do they know? In other words, if they don't get the letter – Form. The form, as I understand, as the D.C. Circuit says, is one page, and as I think our district said, two pages, but it doesn't matter. How do you – if you're an insurance company and you're the insurance company of a plan, how do you know that somebody objects to the contraception mandate? And isn't providing the coverage and isn't submitting a form to you. Well, I think that you would – that the entity would have to tell its insurer, I mean, what it wants. But the point is, they're saying they're not going to do that, because that's what it is. But they have to tell. I mean, that's one of the ironies of this. This sounds like a discussion with my daughter 20 years ago. I'd say, you have to do this. You just have to. And you just have to. Because. What am I going to do to her when she doesn't? Because she has to do it. But if there were no – I guess my only point is this. If there were no government regulation, they would have to tell their insurance company just, look, here's what I want, here's what I don't want. That's what they would have to do. I mean, so all we're saying is. But you keep saying they have to. No, but you would have to in order – if you're going to provide insurance, you have to tell your insurance company what it is that you want provided. I mean, you'd have to say, I want this kind of a plan, I don't want this kind of coverage. And that would be the case if there were no contraceptive coverage regulation. They would say, I don't want, you know, I don't want to have that. But the objection is not to telling them in the abstract. That is not the objection. The objection is to the, quote, trigger effect. Right. Which case is the most analogous as far as you're concerned? You line up the cases that have been decided. What would you say this is the most like? Because the 6th, the 7th, and the D.C. Well, no, I was going to say Bowen and Kemmerling and the other, the DNA case, the Social Security, kind of reason through. I mean, I think it's, I think it's, like, the D.C. Circuit opinion, I think, did a good job going through the precedent. I thought that the discussion of Bowen, like, you know, I thought was sort of particularly apposite because, again, at this point. I mean, the act itself, the conduct that the individual or here the college has to perform is not what imposes the burden on itself. That's right. It's what follows from that. That's right. And particularly under the augmented accommodation where it's a question of telling the government and then the objection really, however this is sliced, the objection really is to what the government does with the information once it has it. Are we not under the augmented regulation in this case? No, we are. Those regulations are effective. Okay. 2014 year. They're effective. I mean, there is no doubt that the plans could use the augmented regulation right now. Right now. Yeah. Because they were made sort of effective, sort of, you know, unpursuant to the good cause exception. They're going through notice and comment, but they were promulgated. What about the good cause? The district court here said, you know, dropped a footnote that, well, there might be good cause by virtue of, no, I'm sorry. I'm in another compartment. Never mind. That's in all three cases today. Right. That's another issue that the D.C. Circuit dealt with at some length, if we think correctly. I understand if we get to it. The least restrictive alternative, which is a real can of worms, it seems to me. How? One, how does that burden satisfy? Is it just that we use common sense or intuition and kind of go through all the theoretical possibilities of statutory and regulatory constructs, what one could come up with, or we like to see what's on the record. How do we deal with the obligation under RFRA? Two, if there is a substantial burden, and I don't think compelling interest is at issue here. If there is a substantial burden, I'm not saying there is, but if there is, how do we get to the fact that in addressing your compelling interest, you have to do it to the least restrictive means? Well, I think that although Hobby Lobby didn't address whether it was the least restrictive means as opposed to a less restrictive means, that Hobby Lobby and Wheaton taken together certainly provide guidance because the key point was that the court kept emphasizing, and that's the majority opinion in Hobby Lobby, was that the net effect on women was zero. I mean, that was very important. Explain the back up. You said the net effect on women was zero. What do you mean by that? By the fact that the way that the accommodation works, women don't have, there's no additional step or hoop for women to jump through in order to have the coverage. It's coming to them separately. They're all the caveats established by the regulations. I'm looking at least restrictive in terms of its impact on the substantial burden. Again, if we were to get to that. How is that least restrictive? Well, it's got to be a least restrictive in the sense that it also accomplishes the aim. You mean that it provides contraception coverage? Yes, and it covers it in a way that doesn't place added obstacles in the way that women are going to be able to get that coverage. So a scheme that says, well, you can get a tax credit at the end of the year, you know, is not the same. All those things make sense to me, but why is it less restrictive than a single-payer scheme? Well, I mean, a single-payer scheme, I don't think that it's ever been thought that you'd have to sort of prejigger the entire sort of way that sort of healthcare is financed in the country in order to do it. I mean, yeah, if we had a single-payer system as opposed to the system of, you know, employer-provided insurance, that would be an answer. But within the system as it exists, what we have is an accommodation that does sort of, that requires an employer to do nothing more than say, I don't want to be in. It's hard to know how much less restrictive you can do. It's a self-identifying process. I think ultimately in any scheme, there would have to be some statement to the effect that I don't want to provide this insurance. And again, in any of these, the objection isn't to saying it, it's to the fact of what the government is doing. And if the government said so that the government is taking all the steps to provide the contraceptive coverage, it's requiring the insurer or the third-party administrator to do it. It comes at no expense to the plaintiffs. So the government is already doing all of those things. All a plaintiff has to do is to tell the government, I'm not, I'm not, you know, I'm out. What about providing a list of names? It's not clear, and the two of you seem, you and your friends who asked, I seem to be disagreeing on whether or not there's a requirement that the, not the third-party insurer, that's not the case now, but the government or someone be given a list of names of the employees or insurers. The government isn't asking for a list of names. There's nothing in the regulations that suggests that. The government is dealing with the insurance companies. The insurance companies have the names. But the government isn't asking for any names. So I think that's just simply wrong. Okay. Anything else? All right. Yeah. Okay, we'll hear back from you, Mr. Decker. Thank you very much. Good morning, Your Honors. May it please the Court, I'm Mickey Pohl from Jones Day for the Plaintiff Appellants in the Persico and Zubik cases. Mr. Baylor, who will get part of our 15 minutes or whatever the right time is, is going to do the Geneva College part with me. Well, you remind me of somebody, and I've been sitting here trying to think, who in the heck is that? I have no clue. But does somebody remind you? I used to be on the Chair of the Lawyers Advisory Panel under Judge Becker from the Western District.  I'm worried. So with me today is Monsignor Robert Smith, the Vicar General of the Erie Diocese, and Susan Rauscher, one of the named plaintiffs. Is your position different from Geneva College? There are some factual differences which are significant. The questions were terrific. I'll answer that one first. My plaintiffs are, there are a couple that are technically exempt, and there are many that are not exempt, not grandfathered. And the dividing the church argument, which I'll address later, is basically that religious employers, you can't narrowly define that category. They should all be exempt. But that's at the end. But right now all of my plaintiffs. I thought churches are religious employers. Houses of worship. And that is not consistent with the constitutional referent. The free exercise of religion does not stop at the church door. There's a wonderful Harvard Law Review article at 103 Harvard Law Review 1409. Aren't they all wonderful? No. Well, Judge McConnell, who's now in the Tenth Circuit, explains at page 1046 how freedom of worship was rejected in favor of the broader term free exercise. But your question is, with regard to insurance companies and TPAs, all of my non-exempt plaintiffs are self-insured with third-party administrators. And that means basically they do the paperwork for you, and then they charge you what's been paid out. TPAs. TPAs. Now, that's a critical distinction. Mr. Baylor can address his client's facts, but a critical error in the Seventh Circuit opinion that Judge Posner made was that he said there is an independent obligation out there for insurers and TPAs to provide this coverage. With respect to TPAs. Provide this coverage? The contraception coverage. Now, that has been recognized by none less than Justice Sotomayor as wrong with regard to TPAs. In footnote six of her dissent in the Wheaton College injunction that was put out, she said Wheaton's third-party administrator bears the legal obligation to provide contraceptive coverage only upon receipt of a valid self-certification. So if we step back and look at my point. That gets to my question about the obligation. Right. There is no obligation. I mean, if my clients all arrange their plans not to provide this, and they have really good plans because they think it's their moral obligation to do so. When these regulations came in, if they do nothing, they get fined out of existence. It's the financial death penalty. So now we're told that's the substantial pressure to go on to the accommodation track. Now, not to quibble with what my worthy opposing counsel said, in Hobby Lobby, Justice Alito specifically said we do not decide today whether an approach of this type, the accommodation, complies with RFRA for purposes of all religious claims. Did not decide that. Justice Ginsburg in footnote one of her dissent concedes that was not decided. I think that's clear. I mean, we wouldn't be here if it didn't. But let me ask you what the burden, what is the substantial burden? Is it the filing of the form itself? It's the filing of the form. To call it an opt-out is a mislabel. It's an opt-in. I don't really care what you call it. What is the burden that you say is imposed upon you based upon the fact that you have to file a form? And that is the substantial burden. It's a lot more than filing a form. If you look at the reg under either form 700 or the new RFRA. Here's what you have to do. You know, I give your name, why you object, what parts you object. Then you have to give your plan, name, and type. How does that affect your exercise, free exercise of religion? Because that's where you become complicit. You have to be in a continuing relationship to always be letting them know who your employees are, who their dependents are, who's in and out of the plan. Wait, wait, complicit. Isn't it really the result of what you do that you object to, not what you're doing in and of itself? That's not right. The record in the case that was established in our case in front of Judge Schwab shows that Catholic teaching deals with cooperation with evil, moral complicity. And if you and the government erred in analyzing this as either a physical burden, they said, oh, you have to assign your name. And that's why Judge Schwab used the objection. Because a lot of times an innocent act of itself becomes sinful, moral, unethical, when you know the consequences of what might other be an innocent act. That is the consequences of the act, not the act itself. It's not the physical act. It's not the financial burden. Here the burden is when you, if you do nothing, the people don't get the coverage. You're not a causal link in the delivery of the services you consider sinful or immoral or unethical. But if you sign that form and you get into the continuing relationship of these are the people that get the stuff and this week they don't and here's their names and addresses, you are basically a causal link. But he just said we didn't need the names. Well, I refer the court to if you compare the Sixth Circuit decision, which improperly built on Notre Dame, Judge Karen Nelson Moore says they already have the names. And if you look at Justice Sotomayor's, if you look at Justice, if you look at Justice Sotomayor's dissent. You can do whatever you want to, but it's going to stay in my mind whether you answer it or not. Well, there's no, I hate to say there's no easy answer, but Justice Sotomayor in her dissent in Wheaton College says how else are the insurers going to know who to give the services to? Because they insure the health of the people who are employees. Third party administrators, we're all part of a church plan. Now, they're dividing the church. The employees of the diocese are exempt. Catholic Charities in Erie is exempt. In Pittsburgh they're not exempt. Well, you would have to go to your third party administrator on a continuing basis and say, these are diocesan employees who don't have to get it because we're exempt, and these are charities or school employees who are supposed to get it under these regs. There is this communication link established that results in the delivery of the services. Why is that a burden? I think Judge Rendell asked, I think she did, where is the burden? What is the burden? Is the burden signing and saying we don't want contraception? The burden is the, and this is consistent. You said the burden is the complicity. This circuit has a wonderful opinion, Washington versus Clem, and it was authored by Judge Brooke Smith that defines substantial burden exactly. And you don't look at the physical act or the financial act. You look at what the adherent, the believer says he or she believes. How is that a burden? Well, if this is where the cases decide this for the court, as Judge Rendell pointed out in her dissent in a case called Laboon, it's not for courts to get into what's religious enough. Thomas in the Supreme Court says. No, we get into substantiality by virtue of RFRA. And so we're looking at the substantiality of the burden. We're not looking at the sincerity. Well, that's agreed. But the burden here is if you say, well, this doesn't look like a big deal, you've offended Thomas. The cases that come out after Thomas, the way I suggest respectfully you have to decide this is, if the believer has a sincerely held religious belief, and you look at Washington v. Clement, it was about his right to have books in his prison cell, an exercise of religion. If you look at that and the believer says, I am now pressured to take some action that causes me to violate my religious beliefs. Now, Kammerling and Ling, which were referred to, said there's no substantial burden because absolutely no action was required. Kammerling, he didn't object to giving DNA. He already had the DNA. He objected to what the third party was going to do with it. Ling was building a road through a forest in the Northwest Territories that the Indians said they used for sacred observances. Well, but in Bowen there was an act. Bowen was... Applying for Social Security. He didn't object to the fact that the child had a Social Security number. The hospital assigned it. He objected to the government trying to use it instead of the kid's name. Now, in all those, there was no action. And that's why the government keeps trying to get everybody off the trail, saying it's an opt-out. There's nothing you have to do. That's wrong. You have to keep giving these six kinds of information about your plan all the time. So before, everybody conducted themselves so they never got in the middle of delivering these services. And now, if you look at... We don't think the IFR is properly in the record. If they wanted it in, they should have... Well, doesn't it come down into issue, which is tantamount to the choice counts at the proximate cause? You're saying that you're being forced to be complicit in activity which you believe is sinful. The government is saying all you have to do is an administerial act, and the cause that follows after that, the results in what you're alleging is sinful, is not pursuant to what you're doing, but it's pursuant to governmental policy and governmental action. That's what Posner said in the Seventh Circuit with the D.C. Circuit said in the Sixth Circuit. What's really happening here is it's the governmental action which is causing to happen that which the church objects to. It does sound more like the concept of proximate cause. And we started agreeing to that. We're going to be talking about how many angels are on the head of the pin because there's no real answer to that question. That's how you look at it. It's a great question. In the East Texas Baptist case, the judge there did the causal analysis, said this form makes you a causal link, and that's why he issued the injunction. Religious believers shouldn't have to do that if it's a causal link in complicity. Isn't the causation even a little bit more attenuated? Because if the insurance company offers these services, but no one uses them, and none of your employees use them, and you send out a directive saying even though you're going to be offered these services as a condition of employment, you know, we don't want you to avail yourself. If nobody uses the services, that's really what you object to. That's what is the violation is if someone actually uses these. With all due respect, Judge, we are not in this record saying that people can't get these services. There are less restrictive means they can get. What are they? Well, in the district court, I'm happy you asked that question. The first would be on health care bonds. Well, this is in my closing argument on day two of our evidentiary hearing. The first would be you've got healthcare.gov out there. Somebody is not getting the services because of the religious objections of their employer. They go on. They put in their zip code. They're told which insurers serve their area. They get connected directly with it. My clients are out of the causal chain. Secondly, like with immunizations through county health departments. What happens if they don't financially qualify for it if they can't afford it? No, no. They get it free. The insurance companies have a 15% incentive. They get a markup on the fee they pay to federal insurance. Only if they're within the employee scheme or the insurance scheme. No. If right now the government says under the regs insurers, if you're already issuing a qualified insurance policy, you have to give it. The problem as to my clients, and this is in the record, are the TPAs. So when the judge invited the government. If that's the scheme, then it would seem to me you could also argue the very fact that you have a TPA out there which is engaged in insuring employees and students in some cases. If someone who's an employee of your institution goes to healthcare.gov and gets contraceptive services that way, that there's a causal link there somehow and therefore you shouldn't have to provide any insurance at all. The point I made and the district judge nicely invited the government to address these. Why couldn't you give it directly to them like you give immunizations? Why can't you give them a tax credit? Why can't you list insurers? Just get us out of the causal change. These are people who have given their whole life. They set up their insurance plans, their self-insurance, to be sure their consciences weren't violated by participating in the delivery. It's the conscience issue that you say is the substantial burden? The definition in this circuit is, which is consistent with Hobby Lobby, leaving aside the denial of benefits cases. This is from Washington v. Clem. If the government puts substantial pressure on a believer to modify his or her belief and take action in violation of their religious beliefs, that's a substantial burden. What is the action? You just used that word. And I think following up what Grendel asked before, is there any action? When you do the six things listed on form 700 and you have to do them on a continuing basis, and the only difference between what he says the alternative augmented regulation is, that instead of doing these six things directly with your insurer or TPA, you can tell the Department of HHS to notify them. That is a distinction without a difference. As the judge, Judge Rosenthal, said in East Texas Baptist under a causation. That's a district court, right? It is. Okay, but should we follow the precedent of a district court when there are three courts of appeals who have decided differently? Well, I think you're obligated to follow the precedent of the U.S. Supreme Court, and that's Thomas, Ling, and. . . We're reading Thomas and Ling, I think, differently than. . . Well, Ling requires no action. I agree that the way you're looking at Ling and Thomas, all those cases, the government action was going to happen regardless of what the believer or nonbeliever did. The road was going to get blocked. Right. And here. . . And that's true in the Social Security case. Because there's this controversy about do they know who's in the plan, who's not in the plan, who's exempt, who isn't. They're saying you become the conduit of information, and we use your plan to become the conduit of providing the services when there are multiple least restrictive alternatives. And when the court invited the government to put in evidence, it's page 47, I believe, of Judge Schwab's, the government said there are only evidence in this record. You know, this isn't a legislative hearing. The court is reviewing a record based on what's in there. They said the only thing they pointed to was one sentence from the administrative record that said other alternatives were considered. It doesn't say least restrictive. It doesn't say what they were. It doesn't say what the cost would be. But we don't have to assume that they weren't the least restrictive. I mean, you don't. . . No, there's no evidentiary basis to conclude there was a least restrictive, what they picked, especially since we can list many, many least restrictive that are already in place that would get us out of the causal delivery chain. Well, maybe you should hear from Mr. Baylor. Your Honor, if I could just close with one sentence on the. . . If you can close with one sentence, it would be the first time in the history of your government that lawyers have ever closed with one sentence. Your Honor, I forgot you remembered me that well. But a separate basis that the government fails to address is the free exercise dividing the church. Period. Okay, that's the sentence. Okay. Thank you very much, Your Honor. Thank you very much. And I'll be quite willing to jump up and answer any more questions. I'm sure you will be. It's important that these people have given their lives. No, I understand that and appreciate that. Mr. Baylor? Mr. Poulos has very graciously offered to take some of your time by jumping up in the middle of your argument. Isn't that nice? May it please the Court. My name is Greg Baylor, and I'm here on behalf of Geneva College. Your Honors, there are approximately 350,000 religious congregations in the United States, and the government has categorically exempted all of them from the HHS mandate on the stated rationale that these entities are more likely than others to employ people who share their religious convictions. That perfectly describes Geneva College, which draws the members of its community from among those who share its religious beliefs, including its beliefs about the use of abortifacients. Yet despite fitting this rationale for the exemption, the government has persistently withheld the exemption from Geneva College. Explain that. How has the government withheld the exemption from you when it said this is all you have to do to not have to do something which you're saying would violate your religious beliefs by being complicit? And I think that is the grounds. It's the complicity, which is, and that's Mr. Poulos' argument, it's the complicity in a process which he believes his client views as sinful. That's the substantial burden because it's making him do something which he thinks is sin, or the organization in the end. Right. How is, we'll follow through with what you're saying. Sure. How are you in that situation where the government? This is an equal protection argument. The government is saying this is what you have, if you do this, you will not have to be put in a position which you think would be compromising religious beliefs. Right. To focus on the exemption and the way that the government withheld it from Geneva is by defining the exemption so narrowly that it only includes those entities that, oddly enough, don't have to file informational tax returns. Geneva is not. Because they're churches. Because they are churches, but why did the government pick that narrow category? Well, I don't know, but the rationale they've offered is that churches, integrated auxiliaries, religious orders denominations are, in the government's view, those employers that are likely to hire co-religionists. Well, that's Geneva. I don't think the government understands. What's your argument? Again, is it an equal protection argument? They can't arbitrarily choose church, church, churches, and non-church people with the same beliefs? Is that your argument? We haven't asserted it as an equal protection argument. Where it's relevant to the RFRA analysis is in two places, least restrictive means. Well, with respect to churches and religious orders and integrated auxiliaries, the government's response to them is categorical exemption. But you need to get substantial burden. To be sure. That is exactly right. Which is the same as, presumably, the same as your colleague, the substantial burden aspect, the filing of the form which makes you complicit. Well, we would identify the burden at the place where Geneva is being pressured by the government to offer insurance. And also, turning the act of providing insurance from something that was morally praiseworthy, morally acceptable, consistent with Geneva's religious beliefs, into something that is now not permitted. You can decline to offer any coverage at all. Pardon me? You can decline to offer health coverage to your employees, correct? Yes. Well, we would pay. We would pay substantially, a half a million dollar fine under the employer mandate 49H in the IRC. Excuse me. Isn't Geneva a college? Isn't it called Geneva College? Yes, ma'am. Isn't it a school? Isn't that what it does? Yes. It's not a church. People don't go to it for services. They go to it to learn. That is correct. They do have required chapel. But it's important to note that they fit the rationale for the exemption, just like churches do, because of whom they hire. You mean because they're religious? Not because they're religious, but because everyone who works at Geneva College is a Christian. And everyone pledges. You mean you don't take non-Christians? In terms of the employment, Geneva hires only Christians. That's correct. Oh. Couldn't get a job in the U.S. Sorry. And that's not an uncommon phenomenon. And that's not an uncommon phenomenon. There are probably about 200 colleges in the country that are sort of faith-based in that way. And there are exceptions for the discrimination laws. Right, right. And it goes, to follow up on your question about where does this matter, it also matters with respect to compelling interest. When, under Ocentro, a court analyzes the compelling interest question, it doesn't look at it broadly. It looks at it with respect to the claimant. Well, Geneva has people who don't want abortifacients. And it makes no sense. They don't have to get them. However, the act of making them available to its individuals, let's face it, Geneva knows, just like any other entity knows, that there's not going to be 100% compliance with all of its rules and requirements. And Geneva can't take the chance that it will be complicit in even one death. The question is that because some of the people at Geneva College are not what you would define as good Christians, that's your argument. You should not be required to comply with this provision, which allows you to opt out of the contravention contraceptive coverage because some of your employees and students are not good Christians. That's what you just argued to me. Some of your people are not good Christians. As a matter of reality, I think it's reasonable for Geneva to predict that if this coverage is provided, if separate payments for these drugs and devices are made, that someone will use them. Okay, then that goes back to the individual choice of the employees. But Geneva College's employees and students don't want this, but at the same time Geneva can't be forced to provide coverage that violates its convictions. The problem is not the form. It's not EBSA 700 or the notice under the augmentation. It's the fact that when they make a decision to provide insurance to employees and students, what will inevitably attach itself to that decision is access to abortifacients that did not exist before, access that will end when the individual stops participating in Geneva's health plan. But that's a matter of government policy. I mean, if there weren't a government requirement across the board that these services are provided, your argument would make sense. But since there is that requirement, you get down to Posner's reasoning in the Seventh Circuit opinion that that's really what you're objecting to. Well, it sounds like if the government is the source of what you're saying, it sounds like if the government is the source of an obligation, you can't object to it. Well, that's obviously not right. Well, no, but if there is an obligation that imposes a requirement, whatever you do, you are not the cause. The government regulation is the cause. We are the cause in the sense that the regulation, the requirement, only applies to us if we decide to offer insurance. That's something that we want to do, but we want to offer insurance that's consistent with our religious beliefs. We want to offer insurance that doesn't open the door to access to abortifacients. Well, thank you for pronouncing it. I kept looking at it. Abortifacient? Yeah. Yeah, and, you know, it points, it's worth observing, although I think an entity is obviously entitled to object based on its own religious views. But Geneva objects to four things, ELA, Plan B, and two IUDs, not to the comprehensive panoply of things that have been required. And, in fact, the women's preventive health mandate that's in the statute requires eight things. Geneva is happy to comply with seven and most of the eight of those, plus the 135 other things that are required by the statutory preventive services mandate. Do you believe that providing health care for women is a compelling interest? Providing health care for women, I suppose, is abstract. Including what I guess the D.C. Circuit called preventive health care. Is that, is it important, is it compelling to have women have services available equal to those that men have? I think it may well be. For example, Geneva is happy to comply with those portions of the women's preventive care mandate for well women visits, for HIV screening, for domestic violence screening, for HPV screening. But there was a lot of evidence that pregnancy can cause health problems to a number of women. Sure, that's right. Right? Yes. So what the statute and the regs do is say, all right, if you don't want to open yourself to those physical problems, you can use the sterilization, you can use contraception. Right. And Geneva is happy to include in its plan sterilization and 16 out of 20 forms of contraception. But as to the legal question whether the interest in forcing Geneva to provide access to for abortifacients, it's difficult, I think, for the government to argue that that's compelling. The United States Preventive Services Task Force did not put that on its list. Congress itself did not explicitly include any contraceptives when it passed the ACA. The preventive services mandate as a whole does not apply to any grandfathered plans. And the Supreme Court said in Hobby Lobby that there are probably between 50 and 100 million women who work for employers that have grandfathered plans. And if it were so important to put abortifacients in the hands of women who work for these employers, why hasn't the government done anything since 2011 to put these things in the hands of women who work for grandfathered employers? They do decrease over time, though, don't they? The number of people included in those grandfathered groups fades out over time. Yes, that is true. But the religious employer exemption will continue to exist in perpetuity. And a rough estimate of the number of women who work for such entities who are exempt, and I said before there's about 350,000 religious congregations. Suppose the average congregation employs just three people. Well, that's a million people who are going to go without this allegedly compelling benefit. Geneva just wants to be part of that large group of exempt religious employers. And, again, it fits the rationale for that exemption. Well, again, your argument is not that you want to be part of the exempt group. You're part of the exempt group. The issue is how you get there. No, Your Honor, we are not part of the exempt group. We're not exempt to say that's right. But to be exempted, put it that way, you can be exempted if you follow certain procedures and you're objecting to the procedures because of the complicity of it. We're not really objecting to the procedures. The alternative compliance mechanism doesn't solve our problem. You just said you're not objecting to the procedures. We're not objecting only to the procedures. But the heart of our objection is the government making our decision to provide insurance morally equivocal, morally impermissible. The fact that there's this accommodation, which does not take away our complicity, it doesn't change the fact that when we offer insurance, our people, we're polite Christians, will get access to these morally objectionable drugs. There is a dramatic difference between the accommodations. But the individual doesn't have to take it. In other words, the woman who's at issue doesn't have to use any of them. That is correct, Your Honor, and that is precisely the argument that the government made in Hobby Lobby and that the majority of the court rejected. The government's main argument about substantial burden in the Supreme Court in Hobby Lobby was that the connection between Hobby Lobby's decision to provide insurance and the use of an objectionable abortifacient was what? To attenuate it. The court said, hey, you cannot second guess a religious claimant's attenuation analysis, a moral analysis. In the district court, the government argued attenuation. Then it became problematic for them to continue to argue that in this court, so they came up with another phrase, opt out. Well, it's not an opt out. It's not the holding, per se. But what do we do with the language of reading college, which clearly suggests that if a procedure is created whereby the government does not have to submit a form to the TPA, which creates a direct conflict, but simply informs the government that it wants to avail itself of this, you might call opt out, this mechanism, that that would seem to be okay under the ACA. What do we do with that language? Well, I will just say at the outset that Geneva has two insured plans, so it doesn't have quite the same mechanism as a self-insured that's communicating with TPAs. When Wheaton College notified its TPAs under the Supreme Court order, at that time the notice that was provided to the government did not authorize the government to order the TPAs to provide separate payments for the objectionable services. That's why the Wheaton College order was acceptable to Wheaton. Since that time, the government has, I mean, this is, again, not my case because I don't have self-insurance, but has gone far beyond what ERISA permits them to do and is now designating TPAs as planned fiduciaries. It's changing the terms of the TPA contract. All of that is an administrative law issue that is being argued in other cases about whether the government has the authority to do what it did on August 27th. But I would say Wheaton College's solution was acceptable to Wheaton because it understood at the time that that notice would not be used to put objectionable abortifacients in the hands of its people. Okay. That wasn't the 2014 register? Yes. I think if I'm understanding you correctly. Well, that's it. Yeah, it was. Yeah, we're talking about August 27th interim final rules. Okay, thank you. You don't have a concluding sentence, by the way, do you? I would have trouble limiting myself to that. Okay. Candor, thank you. Mr. Stern, you reserved five minutes, I think. I did. Don't feel compelled to take all five. I'll try to be very brief. Okay. But not in one sentence. No, I can't do one sentence. Just the – I think that what the colloquy with opposing counsel sort of repeatedly underscores is that what's being objected to is what the government does itself and requires after, and I won't call it an op-ed, if that was problematic, after an entity says to the government, I don't want to be part of this plan. If you look at it, the one set of lenses, you'll see it one way. Look at it for another set of lenses, you'll see it another way, and we have to squeeze that into the two prongs of RFRA and the First Amendment that grew out of it. Well, I think that certainly that's what the court's obligation is to do. I don't really think there are two fair ways of looking at this. For example, I mean the – Well, it's fair. It's a fair argument. It depends on – again, it depends on where you go into it. The old saying, where you come out of an issue depends on where you go into it. If you go in from your perspective, then there's only one fair way to look at it. If you go into it from their perspective, there's only one fair way to look at it because you're perhaps very unwittingly causing them to be complicit in an activity which they define as sin and under the law that would be – if we're forcing them to do something which is sinful, by definition, that's a substantial burden on a religious belief. It all comes down to how you look at this thing, where you go into it. Well, I mean, I think ultimately those are the conclusions, but those are the reasons the court has to get there. I quite agree. The reason that we think that the court should conclude that there is no substantial burden and that the requirement slash opt-out would survive strict scrutiny – and maybe you can do something without – if you can, and I'm not trying to slight it or say I disagree with it, if you can answer this question without being into the Posner-Notre Dame analysis, why wouldn't requiring a religious organization to do something that, if done by them, they would deem a sin and that if they don't do that, they're going to be heavily fined – fined out of existence, I don't know, but heavily fined, possibly fined out of existence. Why wouldn't that be so coercive as to be a substantial burden? I mean, again, by that logic, a conscientious objector could say, you know, even taking – even just being announcing that I'm a conscientious objector is sort of something that I regard as sinful. It's cooperation. That's based upon the compelling interest of reason or – Well, no, but the – no, I'm saying that in terms of – that you don't have to get to substantial interest in analyzing those things, that if you have an opt-out scheme, it is not a substantial burden to say, it would offend my religious beliefs to participate in this scheme. I don't want to. And that's a factual question. Whether it's a substantial burden – That's a question for – that's a question for the court, whether it's – Well, the substantiality is a question of law. Yes, I think it is a question of law. And that's really – I mean, the argument is I am complicit and therefore it's a burden. But the question we have to decide is the substantiality of that. Or what is a burden? Or what is a burden. I mean, but even if we agree that the complicity is sufficient as a burden, even if we were to agree that, still, that's a substantiality. That's correct. One can accept for purposes of argument at least that it's a burden. The question is whether it's a substantial burden. And the – with respect to – Well, what about Mr. Poole's definition, which is taken from our cases, about what a substantial burden is. And that's why I phrased my question to you the way I did. If it causes one to do something which that person has a sincerely held belief will result in a sinful act. But I think that that would collapse. Take and apply it. I think that that collapses the sincerity and substantial burden. Because it can't be that it's enough to say I have a sincere religious belief that this would be sort of a sinful thing to do. Because then that sort of removes from the analysis the substantial burden. And, again, in Hobby Lobby, like the majority opinion, 134 Supreme Court, 2763, describes the – sort of in talking about the way that the accommodation work says that those entities are effectively exempt. Now, that's certainly not a whole. It doesn't – I totally agree. We're not suggesting that Hobby Lobby addressed the validity of accommodation. We do think that its reasoning sort of should inform this court's analysis, as should the subsequent ruling in Burwell, which made absolutely clear that HHS could rely on what it had received in terms of sending out notices. I mean, there's no – I don't quite understand the attempt to sort of distinguish but to suggest that that wasn't true in Wheaton College. So I do think that Supreme Court has provided us with a great deal of guidance. We do think that the three circuit courts that have addressed the issue so far have analyzed sort of all of the arguments that are presented here and in different ways have properly rejected them. Thank you very much. Very fascinating, difficult, and interesting case. We'll take a matter under advisement.